UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALBERT YAGUDAEV,

                                    Plaintiff,

                    -v-

CREDIT AGRICOLE AMERICA SERVICES, INC.,

                                    Defendant.

---

18 Civ. 513 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This case involves claims of age discrimination and retaliation by a financial services employee. Plaintiff Albert Yagudaev was an employee of defendant Credit Agricole America Services, Inc. ("CAASI"), assigned to CAASI's Risk and Permanent Control division, between September 2005 and May 13, 2016, when Yagudaev was terminated. He brings this action for violations of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). He alleges that CAASI terminated him, and otherwise discriminated against him, on the basis of age, and retaliated against him for complaining about such discrimination.

With discovery complete, CAASI has moved on multiple grounds for summary judgment on Yagudaev's claims. Yagudaev opposes CAASI's motion, arguing that disputes of material fact preclude summary judgment. For the following reasons, the Court grants CAASI's motion.

# I. Background

## A. Factual Background[1]

### 1. The Parties

CAASI is an entity registered with, and having its principal place of business in, the State of New York. JSF ¶ 1. CAASI provides back office and administrative support to other Credit Agricole entities in the U.S. These entities are all wholly owned, directly or indirectly, by the French banking corporation Credit Agricole Corporate and Investment Bank (collectively, "Credit Agricole"). *Id.* ¶ 2.

---

[1] The Court draws its account of the underlying facts from the parties' respective submissions on the motion for summary judgment, including: the parties' joint statement of undisputed facts, Dkt. 38 ("JSF"); defendant's Local Rule 56.1 statement, Dkt. 40 ("Def. 56.1"); plaintiff's counter-statement, Dkt. 50 ("Pl. Counter 56.1"); defendant's reply to the counter-statement, Dkt. 52 ("Def. Reply 56.1"); the declaration of Frank Argano in support of defendant's motion, Dkt. 42 ("Argano Decl."), and attached exhibits; the declaration of Thomas Damagnez in support of defendant's motion, Dkt. 43 ("Damagnez Decl."), and attached exhibits; the declaration of Maurice Michael Dimenschstein in support of defendant's motion, Dkt. 44 ("Dimenschstein Decl."), and attached exhibits; the declaration of Anne Girard, Dkt. 45 ("Girard Decl."), and attached exhibits; the declaration of Barbara M. Roth in support of defendant's motion, Dkt. 46 ("Roth Decl."), and attached exhibits; the declaration of Kara S. Miller in opposition to the motion, Dkt. 48 ("Miller Decl."), and attached exhibits; the declaration of Albert Yagudaev, Dkt. 49 ("Yagudaev Decl."); the reply declaration of Frank Argano, Dkt. 54 ("Argano Reply Decl."); the reply declaration of Anne Girard, Dkt. 55 ("Girard Reply Decl."); the reply declaration of Thomas Damagnez, Dkt. 56 ("Damagnez Reply Decl."); and the reply declaration of Barbara M. Roth, Dkt. 57 ("Roth Reply Decl."), and attached exhibits.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Yagudaev is a New Jersey resident who was formerly employed by CAASI. *Id.* ¶ 3. Born in July 1965, Yagudaev was age 40 when he began working for CAASI on or about September 19, 2005. *Id.* ¶¶ 4–5.

## 2. Yagudaev's Employment with CAASI

At all relevant times, Yagudaev was an employee in the Market Activity Monitoring ("MAM") team. *Id.* ¶ 7. The MAM team was within the Market Risk Management ("MRM") group, which, in turn, was within CAASI's Risk and Permanent Control division ("RPC"). *Id.* Yagudaev worked for CAASI as a Profit & Loss Analyst with a corporate title of "Grade E4 Senior Associate." *Id.* ¶ 5. In his role at CAASI, Yagudaev supported Credit Agricole's capital market activities by producing daily reports of profit and loss ("P&L") for certain desks, with explanations and analyses of the risk factors relevant to the P&L that he reported. Def. 56.1 ¶ 7. Yagudaev's duties also included, *inter alia*, detecting, reporting, and analyzing "off market" trades; working with the Finance team to identify, explain, and remedy any discrepancies between his P&L reports and those produced by the Finance team; and monitoring the "gap" created between the assets and liabilities of Credit Agricole's "Treasury" business line. *Id.* ¶ 8. Yagudaev was hired on September 19, 2005 at a base salary of $90,000. *Id.* ¶ 151. He received a $2,000 salary increase after his first full year of work. He never again received a salary increase. *Id.*

At all relevant times, Yagudaev reported directly to the head of the MAM team, who reported directly to the head of MRM group, who reported directly to the head of the RPC division. JSF ¶ 8. In summer 2009, Maurice Michael Dimenschstein became MRM's head; at all relevant times thereafter, he was Yagudaev's second-level manager. *Id.* ¶ 10. Dimenschstein was born in 1969. *Id.* In September 2015, Anne Girard became the head of the RPC division, replacing a predecessor who had held the role for more than five years. *Id.* ¶ 11. At all relevant

times thereafter, Girard, who was born in 1968, remained division head. *Id*. Dimenschstein reported directly to Girard. *See id.* ¶ 8. At the time of Yagudaev's eventual discharge, there were two other permanent full-time employees in MAM: Simon Finn, who was born in 1976, and Shivanand Shetty, who was born in 1974. *Id.* ¶ 32.

Yagudaev's direct managers—*i.e.*, the several individuals who, at different times, served as the head of the MAM team—were all French nationals who rotated into the U.S. for a finite and usually predetermined period of time. *Id.* ¶ 12. Between September 2007 and September 2010, Lionel Denizet was the head of MAM (and Yagudaev's direct manager). *Id.* ¶¶ 8, 13. Denizet was replaced by Florent Bonnet, at which time Denizet returned to France. *Id.* ¶ 13. Bonnet held the role between September 2010 and September 2013, at which time Bonnet returned to France and was replaced by Thomas Damagnez. *Id.* ¶ 14.

Damagnez, who was born in 1979, was at CAASI in New York on a three-year assignment. *Id.* ¶¶ 14–15. In August 2016, at the end of his time as head of MAM, Damagnez returned to Credit Agricole Corporate and Investment Bank in France. *Id.* ¶ 15.

### 3. Yagudaev's Job Performance

Throughout Yagudaev's employment with CAASI, he received an annual performance appraisal.[2] *Id.* ¶ 16. CAASI utilized a rating system whereby it graded employees on a five-level scale, with each grade representing a different level of performance. JSF, Exs. 1–8; Def. Reply 56.1 ¶ 18. The specific language accompanying each grade varied slightly over the years. Pl. Counter 56.1 ¶ 21; *compare* JSF, Ex. 1 at 3, *with* JSF, Ex. 4 at 5. However, as a general matter, when CAASI evaluated employees, a rating of two out of five was considered to be

---

[2] Yagudaev notes that CAASI has not produced his annual performance appraisal from 2009. Pl. Counter 56.1 ¶ 17. With the exception of 2009, the parties agree that Yagudaev received an annual performance appraisal each year from 2007 through 2015. *See id.*; JSF ¶¶ 17–24.

"below expectations," a rating of three out of five was considered "meets expectations," a rating of four out of five meant "above expectations," and a rating of five out of five meant "outstanding." Def. 56.1 ¶ 21; Def. Reply 56.1 ¶ 21; *see also* Roth Decl., Ex. 1 ("Yagudaev Dep.") at 103 (Yagudaev conceding at his deposition that a "two out of five" is "below expectations").[3]

Yagudaev received a performance evaluation for 2007 issued by his then-manager Denizet. Def. 56.1 ¶ 19. In the 2007 evaluation, Denizet gave Yagudaev a two out of five rating—*i.e.*, the second-lowest rating—for both "overall competency assessment" and "overall performance assessment." *Id.* ¶ 20; *see* JSF, Ex. 1 at 3. Denizet wrote about Yagudaev in the 2007 evaluation: "Despite his dedication and commitment, Albert needs to work faster and in a more organized manner. Albert lacks of reliability [sic] and should pay more attention to quality and internal procedure." Def. 56.1 ¶ 22.[4] Denizet also provided a 2008 evaluation of Yagudaev,

---

[3] Yagudaev quibbles in several places with CAASI's description of the performance grade Yagudaev received as a "two out of five" or "below expectations." *See, e.g.*, Pl. Counter 56.1 ¶¶ 18, 21 (noting that in some years the second-lowest grade was accompanied by language such as "partly satisfactory" or "*inferieure aux attentes*"). The Court acknowledges the varied language but does not agree that CAASI's labelling Yagudaev's job performance as only "partly satisfactory" or "*inferieure*" in certain years raises a genuine dispute of material fact regarding whether Yagudaev consistently received the second-lowest grade for his job performance.

[4] Yagudaev, here and elsewhere, stated that he "does not possess sufficient knowledge to admit or deny" this statement. Pl. Counter 56.1 ¶ 22. A non-moving party "cannot raise a material issue of fact by denying statements which the moving party contends are undisputed for lack of knowledge and information[,] in part because discovery allows the party opposing summary judgment to obtain the facts necessary to determine whether it must admit or deny them." *AFL Fresh & Frozen Fruits & Vegetables, Inc. v. Del-Mar Food Servs. Inc.*, No. 06 Civ. 2142 (GEL), 2007 WL 4302514, at *4 (S.D.N.Y. Dec. 7, 2007) (internal citations and quotation marks omitted); *see Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 605 (S.D.N.Y. 2013) (deeming admitted numerous factual allegations in defendant's 56.1 Statement to which plaintiff responded by "deny[ing] knowledge or information sufficient to form a belief as to the[ir] truth" (alterations in original)). This statement, as well as others that Yagudaev similarly opposed, is thus deemed admitted.

in which Denizet again gave Yagudaev the second-lowest out of five grades for "overall performance assessment," *id.* ¶ 26, but gave him a three out of five for "overall competency assessment," Pl. Counter 56.1 ¶ 26. In the 2008 evaluation, Denizet wrote: "[Yagudaev]'s performances are often reduced due to a lack of method. A greater sense of interest and organization should help him enhance the quality of the work produced. [Yagudaev] has room for improvement." Def. 56.1 ¶ 27. Yagudaev signed each of Denizet's evaluations. *Id.* ¶¶ 23, 28. Despite having the opportunity, before signing, to write anything on the evaluation in a section designated for his comments, Yagudaev wrote nothing on either evaluation. *Id.* ¶¶ 24, 29.

In September 2010, Bonnet replaced Denizet as the Head of MAM (and thus as Yagudaev's direct manager). JSF ¶¶ 13, 14. Bonnet provided Yagudaev's annual performance evaluations for 2010, 2011, and 2012. Def. 56.1 ¶¶ 30, 36, 49. For 2010 and 2011, Bonnet gave Yagudaev the second-lowest out of five grades for both "overall performance assessment" and "global evaluation." *Id.* ¶¶ 31, 37. These grades were accompanied by the language "[i]nfériure aux attentes" and "[e]n développement," Pl. Counter 56.1 ¶¶ 31, 37, which loosely translate to "lower than expected" and "in development," respectively, Def. Reply 56.1 ¶¶ 31, 37.

In his comments on Yagudaev's 2010 performance evaluation, Bonnet wrote that Yagudaev's "[o]verall [a]ppraisal is considered below expectations because Albert needs to be attentive to what is communicated to external clients [and internal supervisors] . . . ." Def. 56.1 ¶ 32. Bonnet further wrote that Yagudaev "needs to pay more attention before publishing the P[&]L and Attribution. A better control of the P&L file production with the [setup] of consistency checks will help him to send a reliable P[&]L. He also needs to improve his communication with the Manager of MAM and the RM." *Id.* ¶ 33.

One year later, in his comments on Yagudaev's 2011 performance evaluation, Bonnet wrote:

> [Yagudaev] is in charge as a product controller at MAM department since 6 years [sic]. He's considered as a senior staff member. He should have acquired the knowledge to produce P[&]L with a high standar[d] of quality. [Yagudaev] is not enough rigorous [sic] and attentive with its daily production. Files are fuzzy, they need to be simplified, easy to understand for the other members of the team and his manager. Consequently, this year, mistakes have been done which would have been avoided with more attentiveness. Before publishing any results to our client[s], products controllers must ensure that the production of P[&]Ls is reliable and accurate. Significant efforts must be done by [Yagudaev] for this year in order to improve the quality of his job.

*Id.* ¶ 38. On that same evaluation, Yagudaev's second-level manager, Dimenschstein, wrote:

> I would like to highlight that too many mistakes were done in the production during 2011, despite [a] few reminders and requests to pay more attention, to be more cautious before sending any report. Moreover[,] Albert did not inform properly his management about important issues whereas he must have done it. It is a real source of concern for his management. Globally the performance is a real disappoint[]ment."

*Id.* ¶ 39. Yagudaev signed (or electronically acknowledged) each of the 2010 and 2011 evaluations. *Id.* ¶¶ 34, 40; *see* Pl. Counter 56.1 ¶ 34. Despite having the opportunity, before signing, to write anything on the evaluation in a section designated for his comments, Yagudaev again wrote nothing on either evaluation. Def. 56.1 ¶¶ 35, 41.

In early 2012, shortly after Bonnet issued Yagudaev's 2011 performance evaluation, Bonnet and Dimenschstein decided to take a major responsibility away from Yagudaev due to Yagudaev's recurring errors, which had led the MAM team to publish inaccurate data to its clients. *Id.* ¶ 43; *see id.* ¶ 45; Dimenschstein Decl. ¶¶ 10–11. At the time, Yagudaev was responsible for the "Treasury Book," which Yagudaev testified "was the biggest book [of business in his group]. It's the top book, basically." Def. 56.1 ¶ 44; *see id.* ¶¶ 42–47; Dimenschstein Decl. ¶ 10 ("[T]he Treasury Book . . . is Credit Agricole's largest and most

important book."). On February 3, 2012, Bonnet informed Yagudaev via email that Yagudaev was being removed from his responsibility for the Treasury Book. Def. 56.1 ¶ 42. In the email, Bonnet wrote:

> Regarding the issue of the Bond Prices, sent to Finance for the closing of 12/30/2011 and the fact that once again, as we have already mentioned during the appraisal for 2011 last week, too many mistakes have been done.
>
> Due to this, it is no more possible for me to continue in this way. I explained to you last week that we cannot afford to publish wrong data to our clients, production and communication to external client need to be reliable and accurate and check twice if needed especially for the Year End process.
>
> Consequently, from Tuesday 6th[,] 2012, the treasury P[&]L 157 and 479 won't be followed up by you anymore.

*Id.* ¶ 45.

Yagudaev testified that he recognized that losing the Treasury Book was "not a good sign." *Id.* ¶ 46. He further testified that "[t]hey took away the book that I wanted and I didn't see anything going anywhere," *id.* ¶ 47, and that he felt "uncomfortable with the fact that they moved me [off of the Treasury Book]," which played a role in his decision to look for a job outside of CAASI in 2012, 2013, and 2014, Def. Reply 56.1 ¶ 47.[5] Several people at Credit Agricole, including at least one member of Yagudaev's team and at least one individual with authority over Yagudaev, knew he was searching for a job at least as early as 2012. Def. 56.1 ¶ 48.

In January 2013, Bonnet issued Yagudaev's 2012 performance evaluation, in which Bonnet again gave the second-lowest out of five grades in his "overall appraisals" of both

---

[5] The parties agree that Yagudaev had been looking for a job outside of CAASI since at least 2011 but dispute the extent to which his removal from the Treasury Book caused him to continue looking in 2012–2014. *See* Pl. Counter 56.1 ¶ 47 (explaining Yagudaev's other motivations for seeking a new job).

Yagudaev's "Performance" and his "Competencies." *Id.* ¶¶ 49–50; JSF, Ex. 5 at 4–7. In this evaluation, the words accompanying the second-lowest grade in the two categories were "below expectations" and "developing," respectively. Pl. Counter 56.1 ¶ 50. In his written comments, Bonnet noted that Yagudaev had "improved his communication with his manager compared to last year," but still "the manager of MAM expects much more from him." Def. 56.1 ¶ 51. Bonnet wrote that Yagudaev "is not autonomous[;] with his seniority[,] he must be able to take initiative and resolve by himself his daily issues." *Id.* Again noting mild improvement in Yagudaev's communication, Bonnet further commented that Yagudaev had not had "a sharp improvement of the quality of the daily production communicated to our clients," and that Yagudaev "still needs to be more attentive to his production, by checking the accuracy and the reliability of the P[&]L produced before sending it." *Id.* ¶ 52. Yagudaev again signed the evaluation without commenting. *Id.* ¶¶ 53–54.

In September 2013, Damagnez replaced Bonnet as the head of MAM (and thus as Yagudaev's direct manager). *Id.* ¶ 55. Before Damagnez's arrival in the United States to begin his stint as head of MAM, Bonnet warned him that Yagudaev was a poor performer. *Id.* ¶ 56.[6] In December 2013, Damagnez delivered Yagudaev's 2013 performance evaluation, giving Yagudaev the same overall rating—a two out of five in both key evaluation categories—as the prior heads of MAM had given. *Id.* ¶¶ 59–60. In his evaluation comments, Damagnez wrote: "Albert has seniority within the team, he has to be more involved within the MAM project and

---

[6] Yagudaev denies this fact. Pl. 56.1 ¶ 56. However, the deposition testimony Yagudaev cites— in which Damagnez responded "No" to a question about whether "any of the information you put in [Yagudaev's 2013 performance evaluation] c[a]me from another source," Dkt. 48, Ex. 5 ("Damagnez Dep.") at 43—does not contradict Damagnez's statement that "Florent Bonnet . . . told me while I was still in France that Albert Yagudaev was a problem employee in New York," Damagnez Decl. ¶ 9. Still, drawing all inferences in favor of Yagudaev, the Court treats this fact as, at least partially, disputed.

simplify the daily production to gain in efficiency. The production has to remain consistent in the quality and thus can be improved." *Id.* ¶ 61. Damagnez added: "Albert has to focus on being more efficient by seeing how the process is done on the other business line, which can and should also reinforce the higher quality of the daily production. [T]here is a lack of consistency in the daily production and the understanding of the process has to be improved. . . ." *Id.* ¶ 62. As with the previous evaluations, Yagudaev signed this one without adding any written comments. *Id.* ¶¶ 63–64.

In March 2014, Dimenschstein called Yagudaev and Damagnez into Dimenschstein's office. Dimenschstein, who was "extremely frustrated" with Yagudaev's poor performance, scolded Yagudaev and, with Damagnez, told him that he should start looking for a job elsewhere because he was not working out in his current role. *Id.* ¶¶ 65–68. Dimenschstein, who had never discharged an employee, preferred that Yagudaev leave CAASI on his own rather than to fire Yagudaev. *Id.* ¶ 67. After that meeting, Yagudaev, throughout 2014 and beyond, continued to try to find another job. *Id.* ¶ 69. On Yagudaev's 2014 performance evaluation, Damagnez again gave Yagudaev a two out of five for both "overall performance assessment" and "global evaluation," writing: "It is the same . . . [as] 2013 . . . needs more reliability." *Id*. ¶¶ 71–73.

### 4. Yagudaev's February 2015 Communications with Human Resources

In fall 2014, Yagudaev had been in touch with Frank Argano in the Human Resources department about potentially finding another job within Credit Agricole. *Id.* ¶ 76. On February 5, 2015, Yagudaev met with Argano to discuss the possibility of an internal transfer. During that meeting, Yagudaev told Argano that he had had a "falling out" with Dimenschstein, that Damagnez had told him he was "not the right fit" for MAM, and that Damagnez had "moved [Yagudaev's] seat in order to help him work more efficiently," which made Yagudaev feel

"micro-managed." *Id.* ¶¶ 76–80. Argano's notes from the meeting reflect that Yagudaev "feels like a second-class citizen," which Argano explained he wrote in the context of his discussion with Yagudaev about Dimenschstein, who Yagudaev claimed had stopped speaking with him. Def. Reply 56.1 ¶ 81; Argano Reply Decl. ¶ 2. No evidence suggests that Yagudaev made any mention or complaint at that meeting about any age-related animus or comments by anyone. *See* Def. 56.1 ¶ 81.

Later in the day on February 5, 2015, Argano learned that Yagudaev was ineligible for an internal transfer because of his below-expectations ratings on his performance appraisals; Credit Agricole policy barred the internal transfer of employees unless they had a rating of at least a 3 out of 5 (*i.e.*, "meets expectations"). On February 6, 2015, Argano again met with Yagudaev to tell him that he was ineligible for an internal transfer unless his performance improved. At that meeting, Yagudaev told Argano that MAM was "not a personality fit for him" and that there was "miscommunication between" him and Damagnez. *Id.* ¶¶ 82–84. Argano offered to speak to Damagnez, but Yagudaev declined because he thought Argano's doing so "would only make things worse." *Id.* ¶ 85. There is no evidence, and Yagudaev has not claimed, that any person at this meeting said anything about age or indicative of age-based animus. *See id.* ¶ 86. On February 11, 2015, Argano emailed Yagudaev to confirm Yagudaev's ineligibility for a transfer because his "performance has not been satisfactory," noting that "[w]e want you to succeed in your role and stand ready to assist you in any way that we can get your performance to an acceptable level." *Id.* ¶¶ 87–89. Yagudaev did not respond or tell Argano that anything in his February 11, 2005 email was inaccurate. *Id.* ¶¶ 90–91. Later in 2005, Damagnez told Human Resources that Yagudaev "could be a good analyst within [the] finance team" but that "MAM's mission . . . is more complicated." *Id.* ¶ 105.

## 5. The Arrival of Girard, the PIP, and Yagudaev's Termination

In September 2015, Anne Girard became the Head of RPC in New York. JSF ¶ 11.
Girard had been with Credit Agricole since 2001 and previously held the position of "Chief Risk
Officer Japan." Def. 56.1 ¶ 93. Before joining CAASI in New York, Girard had learned that
Yagudaev was a poor performer, from conversations with individuals on the business side of
Credit Agricole (which MAM services) and with senior market risk personnel in Paris—
including MAM's Global Head. Shortly after joining, Girard met with her direct reports,
including Dimenschstein. Girard asked Dimenschstein to identify the high and low performers
in the MRM team. Dimenschstein, who had been Yagudaev's second-level manager since at
least 2011, identified Yagudaev as the only poor performer in his department. Damagnez did not
attend the meeting between Girard and Dimenschstein. *Id.* ¶¶ 94–98.

After determining that Yagudaev "stands out as a 2, meaning low performer," Miller
Decl., Ex. 14 ("Girard Dep.") at 34, Girard requested and received Yagudaev's performance
evaluations. Def. 56.1 ¶ 99. After Girard reviewed the evaluations, Dimenschstein was directed
to put Yagudaev on a performance improvement plan ("PIP") and to terminate Yagudaev if he
failed to improve substantially. *Id.* ¶¶ 100–01.[7] Both Girard and Dimenschstein expected that
Yagudaev would not succeed in improving his performance, despite the PIP, because
"Yagudaev, after 10 years in his job, was still making the mistakes of a junior employee despite
being asked repeatedly, and receiving many opportunities, to improve." *Id.* ¶¶ 107–08.
Dimenschstein, Damagnez, and Argano developed the PIP together, with Girard's approval. *Id.*
¶¶ 103–04.

---

[7] The parties dispute whether it was Girard or Damagnez who prompted Dimenschstein to put
Yagudaev on a PIP.

Yagudaev was first informed of the PIP in his 2015 performance evaluation, which Damagnez delivered to him on January 8, 2016. In that evaluation, Yagudaev again received a two out of five for his "global evaluation," and, for the first time, received a one out of five for his "overall performance assessment." *Id.* ¶¶ 109–10. Damagnez provided detailed comments on this evaluation, explaining that "[t]oo many errors still appear," "[m]any questions are asked and not answered as expected or not answered at all," and "[Yagudaev] failed to demonstrate he can do a better job this year." *Id.* ¶¶ 111–13. Yagudaev again signed his performance evaluation without writing any comments in the space provided. *Id.* ¶¶ 114–15.

On February 5, 2016, Yagudaev began the PIP, which Damagnez and Argano administered. Yagudaev electronically signed the document that placed him on the PIP without making any objection or comment. Argano set the schedule for the PIP, establishing three review periods (approximately 30 days each) during the 90-day PIP, and two meetings with Yagudaev each period to discuss his progress. Both Damagnez and Argano maintained notes on Yagudaev's progress and on their meetings with him during the 90-day PIP. *Id.* ¶¶ 116–122. Yagudaev admitted at his deposition that during the PIP he made "[s]ome mistakes" and missed deadlines, although he stated that the missed deadlines were "systems-related" and not his fault. Yagudaev Dep. at 256–57. For example, on March 2, 2016, Vinod Idnani, an internal client of MAM's at Credit Agricole, told Yagudaev that, as a result of his mistake, the "wrong rates were sent to the Brazil GL for processing," which caused two days of delays for the Finance team. *Id.* ¶ 127; Def. Reply 56.1 ¶ 127; *see* Def. 56.1 ¶¶ 128–29 (additional issues during PIP).

On May 11, 2016, after the PIP period was complete, Girard asked Damagnez for a copy of Yagudaev's PIP review, which Damagnez provided. Def. 56.1 ¶¶ 130, 132. After she obtained the PIP document, Girard made the decision to discharge Yagudaev. *Id.* ¶ 133. Girard

then met with Dimenschstein and Damagnez to discuss the final determination that Yagudaev would be terminated. *See* Pl. 56.1 ¶ 133; Def. Reply 56.1 ¶ 133. On May 13, 2016, Girard met with Yagudaev and terminated his employment. Def. 56.1 ¶ 136; JSF ¶ 31.

### 6.    Yagudaev's Allegations of Age Discrimination and Retaliation

Yagudaev admits that he has no basis to believe that either Girard or Dimenschstein held any discriminatory animus against him. JSF ¶¶ 29, 30. His allegations of age discrimination appear to rest on three oral remarks that Damagnez allegedly made to him.

First, Yagudaev testified that, at some time in mid-2015 when it was "warm enough to go outside," he went for a walk with Damagnez, during which Damagnez allegedly told Yagudaev that he was "too old for this job." Def. 56.1 ¶ 138. Second, Yagudaev testified that—on a date he cannot recall and using words he cannot recall—Damagnez made a comment about Yagudaev's grey hair. Third, Yagudaev testified that Damagnez, at some point, made a remark about Yagudaev's hearing aids. Pl. Reply 56.1 ¶ 138; *see* Def. Reply 56.1 ¶ 138. Yagudaev was asked to produce any contemporaneous documentary evidence supporting this claim—*i.e.*, notes, emails, text messages, journal entries or any other document. He did not produce any. Def. 56.1 ¶ 139; *see* Def. Reply 56.1 ¶ 139.[8] Nor does Yagudaev recall telling anyone at CAASI or Credit Agricole about Damagnez's alleged comments. Def. 56.1 ¶ 140.

On April 20, 2016, about 75 days into the 90-day PIP, Yagudaev sent an email at 4:35 p.m. to the Treasury Trading group at Credit Agricole, which consisted of four permanent employees. In the email, Yagudaev wrote:

> I had a sit-down with [Damagnez] and it didn't go well. They ([Damagnez] and HR) put me on the performance improvement plan and it does not look like I meet his standards. I expect HR will call me by the end of the month and give me my

---

[8] Yagudaev's allegations first appear in writing in a letter, discussed below, sent by his lawyer to CAASI on April 22, 2016, and in a later-filed EEOC charge. Pl. 56.1 ¶ 139.

walking papers. I figure I'd send you my contact information in case I don't get the opportunity to do it when they fire me.

*Id.* ¶ 145. Two days later, on April 22, 2016, a lawyer representing Yagudaev sent a letter to CAASI alleging that Yagudaev believed he had been treated unfavorably because of his age and other alleged protected characteristics. Despite his regular meetings with and access to Human Resources, this was the first time that Yagudaev had communicated anything specifically about age or age discrimination to anyone at Credit Agricole. *Id.* ¶¶ 146–147.

When asked at his deposition whether he believed he was discharged in retaliation for this letter, Yagudaev responded, "[t]hat one, I don't think it—I'm not sure about that one, that particular letter. I'm not sure about that." *Id.* ¶ 149. When asked, "[d]o you know why your employment ended at Credit Agricole," Yagudaev answered: "They didn't approve of my performance." *Id.* ¶ 150.

**B.      Procedural History**

On January 19, 2018, Yagudaev filed a complaint against Credit Agricole Securities (USA) Inc. Dkt. 1. On March 14, 2018, Yagudaev filed an amended complaint, substituting CAASI as the defendant. Dkt. 13 ("Amended Complaint").

On April 4, 2018, CAASI answered the Amended Complaint, Dkt. 21, asserting as an affirmative defense, *inter alia*, that CAASI "had legitimate, non-discriminatory and non-retaliatory reasons for every decision made with respect to or affecting" Yagudaev, *id.* at 6.

On March 8, 2019, following discovery, the parties filed a joint statement of undisputed facts. Dkt. 38. On March 22, 2019, CAASI filed a motion for summary judgment, Dkt. 39, an accompanying memorandum of law, Dkt. 41 ("Def. Mem."), CAASI's Rule 56.1 statement, Dkt. 40, the Argano Declaration, Dkt. 42, the Damagnez Declaration, Dkt. 43, the Dimenschstein Declaration, Dkt. 44, the Girard Declaration, Dkt. 45, and the Roth Declaration, Dkt. 46.

On April 5, 2019, Yagudaev submitted his opposition brief, Dkt. 47 ("Pl. Mem."), his counter-statement to CAASI's Rule 56.1 statement, Dkt. 50, the Miller Declaration, Dkt. 48, and the Yagudaev Declaration, Dkt. 49.  On April 19, 2019, CAASI submitted its reply brief, Dkt. 53 ("Def. Reply"), its reply to Yagudaev's Rule 56.1 counter-statement, Dkt. 52, the Argano Reply Declaration, Dkt. 54, the Girard Reply Declaration, Dkt. 55, the Damagnez Reply Declaration, Dkt. 56, and the Roth Reply Declaration, Dkt. 57.

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is

"required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

Although "an extra measure of caution is merited" in discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence," courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted).

## III.    Discussion

Yagudaev brings claims of discrimination and retaliation under the ADEA, the NYSHRL, and the NYCHRL.  The relevant standards overlap substantially, particularly as between federal and state law, but the NYCHRL is generally more favorable to civil-rights plaintiffs.

The Court first addresses Yagudaev's claims of age discrimination under federal and state law; then addresses his claims of retaliation under federal and state law; and finally addresses his claims under the NYCHRL.

### A.    Discrimination Under the ADEA and NYSHRL

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1).  In the Second Circuit, courts analyze age discrimination claims under the ADEA and the NYSHRL using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106

(2d Cir. 2010); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 571 n.7

(S.D.N.Y. 2010) ("Age discrimination claims brought under NY[S]HRL are evaluated under the

same standards that govern the ADEA." (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498

n.1 (2d Cir. 2009), *superseded on other grounds by* Local Civil Rights Restoration Act of 2005,

N.Y.C. Local Law No. 85 (2005) (the "Restoration Act"))).

Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima*

*facie* case of discrimination by showing (1) that he was within the protected age group; (2) that

he was qualified for the position; (3) that he experienced an adverse employment action; and (4)

that such action occurred under circumstances giving rise to an inference of discrimination. *Id.*

at 106–07 (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000)). If the

plaintiff does so, the burden shifts to defendant to "articulate some legitimate, nondiscriminatory

reason for the [adverse act]." *Mattera*, 740 F. Supp. 2d at 571 (quoting *Leibowitz*, 584 F.3d at

498 n.1 (internal quotation marks omitted)). Defendant's burden is "one of production, not

persuasion." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).

If defendant satisfies this requirement, on a motion for summary judgment, plaintiff

"'must prove, by a preponderance of the evidence, that age was the "but-for" cause of the

challenged adverse employment action' and not just a contributing or motivating factor."

*Gorzynski*, 596 F.3d at 106 (quoting *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 180 (2009)).[9]

In other words, "the burden shifts back to the plaintiff to demonstrate by competent evidence that

---

[9] In *Gorzynski*, the Second Circuit "assume[d], without deciding that the Supreme Court's *Gross* decision affects the scope of the NY[S]HRL law as well as the ADEA," since the law governing claims under the state and federal statutes had previously been held to be identical. 596 F.3d at 105 n.6; *see, e.g.*, *Allen v. Chanel, Inc.*, No. 12 Civ. 6758 (LAP), 2015 WL 3938096, at *4 & n.3 (S.D.N.Y. June 26, 2015) (applying the "but for" standard from *Gross* to NYSHRL age discrimination claims).

'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Leibowitz*, 584 F.3d at 499 (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)); *Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 694 (2d Cir. 2013) (in third step of burden-shifting framework, "plaintiff must prove that the employer's proffered reason was a pretext for discrimination" (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006)).

### 1. *Prima Facie* Case of Age Discrimination

Here, the parties do not dispute that Yagudaev has satisfied the first three requirements for a *prima facie* employment discrimination claim: Yagudaev was over 40 years of age at all relevant times, was qualified for the position that he held for approximately eleven years, and placed on a PIP and ultimately terminated from his employment. *See* 29 U.S.C. § 631(a) (the ADEA protects people over forty years old); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (employment of seven years satisfied *prima facie* burden of showing at least "minimal qualification," especially "where discharge is at issue"); *Gorzynski*, 596 F.3d at 107 (adverse employment action element satisfied by termination). Although the parties dispute whether Yagudaev was discharged under circumstances that give rise to an inference of discrimination on the basis of age, the Court assumes, without deciding, that Yagudaev has met his initial burden.

### 2. Legitimate, Nondiscriminatory Reasons

CAASI, in turn, has plainly articulated a "legitimate, nondiscriminatory reason" for Yagudaev's termination. *See Mattera*, 740 F. Supp. 2d at 571. CAASI contends that Yagudaev was fired because of years of "poor performance," including continued mistakes and missed deadlines after he was put on a performance improvement plan. CAASI amply supports that contention with contemporaneous documentary evidence. As reviewed above, from 2007

through Yagudaev's eventual termination in 2016, CAASI's annual performance evaluations of Yagudaev reflected his failure to meet expectations, as well as the mounting frustration of a rotating cast of supervisors who saw little to no signs of improvement. Yagudaev's removal from his "Treasury Book" responsibilities in February 2012—an action taken by supervisors who either had nothing to do with Yagudaev's later termination, or who Yagudaev concedes had no discriminatory animus—further corroborates CAASI's proffer of a legitimate, non-discriminatory explanation. Even Yagudaev recognized that his removal from these responsibility was "not a good sign" for his future at CAASI. Def. 56.1 ¶ 46. "Poor performance . . . is the *ne plus ultra* of legitimate, non-discriminatory business rationales." *Downey v. Adloox, Inc.*, No. 16 Civ. 1689 (JMF), 2018 WL 5266875, at *5 (S.D.N.Y. Oct. 23, 2018) ("*Adloox I*") (citing *Slattery*, 248 F.3d at 93), *aff'd*, 2019 WL 5445992, at *2 (2d Cir. Oct. 24, 2019). CAASI has clearly met its burden here.

### 3. But-for Causation

To survive summary judgment, Yagudaev's "admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that [CAASI's] employment decision was more likely than not based in whole or in part on discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (internal quotation marks and citation omitted). In an ADEA or NYSHRL age discrimination case, a plaintiff satisfies that burden by proving "'by a preponderance of the evidence that age was the "but-for" cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Gorzynski*, 596 F.3d at 106 (quoting *Gross*, 557 U.S. at 180). The slender evidence adduced by Yagudaev—which solely turns on evidence of statements allegedly made to him about his age by one supervisor, Damagnez—would not, even viewed in the light most favorable to Yagudaev, permit a rational jury to so find but-for causation other than by sheer speculation.

As context, CAASI has marshalled overwhelming evidence—documentary and testimonial—of a non-discriminatory basis for Yagudaev's termination: his consistent poor performance, which, as noted, was chronicled repeatedly and with increasing warnings to Yagudaev of the consequences to him during his decade-long tenure as an analyst. With the lone exception of Damagnez, Yagudaev does not claim that his supervisors had any age-discriminatory animus. With striking consistency, these persons consistently characterized Yagudaev's performance as disappointing and as failing the company's expectations. *See* Def. 56.1 ¶¶ 22, 27, 32–33, 38–39, 45, 51–52, 61–62, 65–68, 114–15, 127 (criticism of Yagudaev's job performance from 2007 through 2016). In Yagudaev's 2011 performance evaluation, for example, Bonnet expressed concern that the data Yagudaev published to CAASI's clients was not "reliable and accurate," and Dimenschstein "highlight[ed] that [Yagudaev made] too many mistakes . . . [and] is a real source of concern for" his supervisors. *Id.* ¶¶ 38–39. These concerns, as documented, grew as Yagudaev, despite notice of his shortcomings, failed year after year to improve. For example, in 2013, Bonnet, who had no role in Yagudaev's later termination, expressed alarm that Yagudaev, despite years of employment in his post, still was not "autonomous" as an employee and was unable to "resolve by himself his daily issues." *Id.* ¶ 51. By 2014, senior managers, including Dimenschstein had grown "extremely frustrated" with Yagudaev's work. *Id.* ¶ 66. The assembled documentary record amassed by CAASI also chronicles numerous managers' dismay when Yagudaev's mistakes repeatedly caused bad data to be sent to clients. Such errors had potential to harm CAASI and Credit Agricole's reputation and business relationships. *See, e.g.*, *id.* ¶¶ 38, 52, 127–29.

In sum, there is overwhelming and undisputed evidence that, between 2007 and 2016, a rotating cast of managers at CAASI—almost all of whom had nothing to do with Yagudaev's

termination, and almost none of whom Yagudaev accuses of age-discriminatory animus—

expressed and documented deep concern about his performance. Indeed, prior to the 2013

arrival of Damagnez and the 2015 arrival of Girard, Yagudaev, in February 2012, had already

been stripped of key responsibilities as a result of his persistent failure to meet expectations. *See,*

*e.g.*, *id.* ¶¶ 42–47. And even once he was put on a PIP, Yagudaev still did not improve.[10]

Finally, corroborating the negative performance evaluations, Yagudaev, after his first full year of

work, never received a salary increase. *Id.* ¶ 151.

 In the face of this contemporaneous proof that Yagudaev was fired for performance

reasons, Yagudaev relies on three stray remarks, which he testified that Damagnez orally made

to him relating to his age. Specifically, Yagudaev testified, that (1) although he does not recall

the details or the date of the conversation, Damagnez mentioned Yagudaev's grey hair; (2) at

another unknown time, Damagnez remarked on Yagudaev's hearing aids; and (3) in early-to-mid

2015, Damagnez went for a walk outside with Yagudaev, during which Damagnez said that

Yagudaev was "too old for this job."

 On a motion for summary judgment, the Court must credit that these statements were

made, and must view the evidence in the light most favorable to Yagudaev, as the non-movant.

The Court does so here. Nevertheless, viewed separately or in combination, Damagnez's

---

[10] In his brief, Yagudaev lukewarmly states that he "was sufficient in his job." Pl. Mem. at 18.
This statement in a legal brief does not counter the mountain of documentary evidence that
Yagudaev's supervisors consistently reached a different assessment. In any event, Yagudaev's
mere disagreement that his poor performance gave CAASI a valid reason to terminate him does
not create a triable issue of fact. *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 29
(E.D.N.Y. 2015) ("A plaintiff cannot merely rationalize, explain, or disagree with an employer's
proffered non-discriminatory reasons to survive summary judgment." (citing *Cardo v. Arlington
Cent. Sch. Dist.*, 473 F. App'x 21, 23 (2d Cir. 2012))).

statements to Yagudaev would not give a rational finder of fact a basis to find that age-discrimination was a but-for cause of Yagudaev's termination.

As to Damagnez's comments noting Yagudaev's grey hair and hearing aids, no evidence links these to any business-related matter, much less to Yagudaev's termination. *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."), *abrogated on other grounds by Gross*, 557 U.S. at 177–78; *see also, e.g.*, *Slattery*, 248 F.3d at 92 n.2 (characterizing remarks as "stray" where they were "unrelated to [the plaintiff's] discharge"); *Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks . . . by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision." (internal quotation marks and citation omitted)); *Adloox I*, 2018 WL 5266875, at *5 (comments made "in a non-business setting, and in no way related to [plaintiff's work]" could not, without more, "establish discrimination underpinning" employer's adverse action). Yagudaev's inability to situate these statements in time further weakens his argument that they raise a triable issue of pretext. *See, e.g.*, *Huminski v. Stop & Shop Supermarket Co.*, No. 16 Civ. 1136 (RNC), 2019 WL 4804913, at *4 (D. Conn. Sept. 30, 2019) (fact that "record is silent as to the timing of the . . . remark" was "factor[] weigh[ing] against plaintiff").

Damagnez's remark, approximately one year before Yagudaev's termination, that Yagudaev was "too old for this job" presents a somewhat closer question, insofar as that remark, on its face, relates to Yagudaev's employment. However, for at least two reasons, that remark could not form the basis of a reliable jury finding that Yagudaev's termination was the product of discriminatory animus.

First, as the assembled case law reflects, "stray remarks," even when made by a putative decisionmaker, do not make out a discrimination case. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (explaining that "[i]f it were otherwise," any terminated employee who testified to having been on the receiving end of a such a remark "would have an instantaneous jury case on discrimination, regardless of the ground for their dismissal"); *see also, e.g.*, *Hess v. Mid Hudson Valley StaffCo LLC*, 776 F. App'x 36, 37 (2d Cir. 2019) (affirming grant of summary judgment to ADEA defendant despite plaintiff's evidence that her manager and her manager's supervisor made repeated comments suggesting that plaintiff was too old to continue working but failed to present evidence of other indicia of improper animus); *Fletcher v. ABM Building Value*, 775 F. App'x 8, 13 (2d Cir. 2019) (affirming grant of summary judgment to Title VII defendants despite plaintiff's sworn statement that her direct supervisor and two other supervisors called her "bitch" and "black bitch," and referred to her as "bubble girl"); *Slattery*, 248 F.3d at 93 (executive's statement that he intended to make the image of the company younger—made shortly before plaintiff's termination—insufficient to show pretext in light of plaintiff's well-documented performance issues); *Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 41–42 (2d Cir. 2012) (affirming summary judgment for defendants on ADEA claims notwithstanding comment by CEO decisionmaker to plaintiff, six weeks before termination, that plaintiff was "71 years of age, how long do you expect to work," which was insufficient to show that employer's stated reason for termination was pretext); *Downey v. Adloox, Inc.*, No. 18-3521-CV, 2019 WL 5445992, at *2 (2d Cir. Oct. 24, 2019) ("*Adloox II*") (affirming summary judgment for defendants on ADEA claims despite CEO and co-founder's calling terminated plaintiff an "old timer" on two occasions and stating that defendant company was "looking for young sharks"). Measured against such precedents, Damagnez's 2015

statement, disconnected from any decisional context, is far too stray to support, other than by speculation, a finding that Yagudaev's age was a but-for cause of his later termination.[11]

Second, Damagnez's statement occurred approximately one year before Yagudaev's termination, and Yagudaev has not adduced evidence of any intervening discriminatory statements or acts. Although there is no bright-line rule for when an alleged remark occurs too far in time from an adverse employment action to be considered causally connected, courts in this Circuit are generally loath, without more, to infer—from a statement made more than a few months beforehand—that an adverse employment action was animated by discriminatory intent. *See, e.g.*, *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 743 (2d Cir. 2014) (context and timing of comment—6 months before first adverse employment action was taken—made it "too remote and oblique to raise a triable issue of pretext"); *Moore v. Verizon*, No. 13 Civ. 6467 (RJS), 2016 WL 825001, at *9 (S.D.N.Y. Feb. 5, 2016) (comments relating to retirement and hearing loss made four months before plaintiff's first suspension and nearly a year prior to her termination were "non-actionable stray remarks"); *Sheridan v. N.Y. Life Inv. Mgmt., LLC*, No. 09 Civ. 4746 (KBF), 2012 WL 474035, at *7 (S.D.N.Y. Feb. 9, 2012) (stray age-related comment made "nearly four months prior" to adverse employment action "cannot support an inference" that action was taken with discriminatory intent); *Risco v. McHugh*, 868 F. Supp. 2d 75, 109 (S.D.N.Y. 2012) ("An isolated remark made approximately four months before [plaintiff's] termination . . . [is] not evidence of discriminatory intent."); *Buckman v. Calyon Secs. (USA) Inc.*, 817 F. Supp. 2d 322, 336 (S.D.N.Y. 2011) (stray remark not probative where made five months before plaintiff's discharge and other facts did not

---

[11] To be sure, remarks may be so repetitive and severe as to prove sufficient evidence of discriminatory intent. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 n.12 (2d Cir. 2004). The record here is not of such a nature.

connect the remark to the discharge).  Damagnez's "too old" remark, made one year before

Yagudaev's termination, does not, without more, constitute sufficient evidence to support a case

of employment discrimination.

Significantly, Yagudaev has failed to adduce any other evidence of discrimination other

than Damagnez's several statements.  On this record, no reasonable juror could find that

CAASI's non-discriminatory reason for terminating Yagudaev—*i.e.*, his consistently poor

performance—was a pretext for age discrimination, or that "but for" Yagudaev's age, he would

not have been terminated.  *See, e.g.*, *Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 24

(2d Cir. 2011) (even if stray remark treated as probative, "remark was insufficient to allow

[plaintiff] to carry her burden in showing that age-discrimination was the 'but-for' cause" of

defendant's employment decisions, in light of evidence of plaintiff's unsatisfactory job

performance).

In light of the above bases for granting summary judgment to CAASI, the Court has no

occasion to reach CAASI's other arguments to the same end, including that the admissible

evidence does not show that Damagnez participated in the decisions to place Yagudaev on a PIP

or to terminate him.  *See, e.g.*, Def. Reply at 2.[12]

### B.    Retaliation Under Federal and State Law

Under the ADEA, it is unlawful for an employer to discriminate against an employee

because that employee "has opposed any practice made unlawful by this section, or because such

---

[12] The only record evidence that appears to link Damagnez to the decision to fire Yagudaev is
Dimenschstein's testimony that he, Girard, and Damagnez discussed "the result of the
improvement plan and the final decision" to terminate Yagudaev.  Miller Decl., Ex. 2
("Dimenschstein Dep.") at 67.  The weight of the evidence suggests that Girard, and possibly
Dimenschstein, were decisionmakers with regard to Yagudaev, but that Damagnez was not.  In
light of the alternative grounds for granting summary judgment, however, the Court has not
resolved whether the evidence could permit a juror to infer that Damagnez was a decisionmaker
as to these matters.

individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). As with discrimination claims, courts analyze ADEA retaliation claims using the *McDonnell Douglas* burden-shifting standard. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006). To make out a *prima facie* case of retaliation under the ADEA, a plaintiff must establish that: (1) he participated in a protected activity under the ADEA; (2) participation in the protected activity was known to the employer; (3) the employer thereafter subjected him to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action—*i.e.*, that a retaliatory motive played a part in the adverse action. *Gorzynski*, 596 F.3d at 110 (citing *Kessler*, 461 F.3d at 205–06). The same standard applies for retaliation claims under the NYSHRL. *See Ehrbar*, 131 F. Supp. 3d at 32.

Yagudaev casts his retaliation claim as "two-fold": he alleges retaliation from (1) the complaints he made to Human Resources on February 5, 2015; and (2) a letter, alleging age discrimination, sent by his counsel to CAASI on April 22, 2016. Pl. Mem. at 23–24.

Yagudaev's February 2015 complaint to Human Resources fails to clear the initial step of the *McDonnell Douglas* test because Yagudaev cannot establish that he was then engaged in any protected activity of which defendants were aware.

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). "An employee engages in a protected activity when she complains of an employment practice that she reasonably believes violates the law." *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011). "'[I]mplicit in the requirement that the employer have been aware of the

protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by' the ADEA." *Pfizenmayer v. Hicksville Pub. Sch.*, 700 F. App'x 64, 65–66 (2d Cir. 2017) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)); *see United States v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 402–03 (S.D.N.Y. 2018) (same).

"Mere complaints of unfair treatment . . . are not protected speech" in the employment retaliation context, and the "onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Brantman v. Fortistar Capital, Inc.*, No. 15 Civ. 4774 (NSR), 2017 WL 3172864, at *7 (S.D.N.Y. July 22, 2017) (citation omitted); *see also, e.g.*, *Collazo v. County of Suffolk*, 163 F. Supp. 3d 27, 51 (E.D.N.Y. 2016) (plaintiff's complaints and requests to transfer out of department "do[] not constitute a protected activity as [d]efendants could not have reasonably understood that [p]laintiff was opposing discriminatory conduct by lodging general complaints about her supervisor's unfair treatment").

In his February 2015 communications with Argano, Yagudaev complained of unfair treatment, noting that he had had a falling out with Dimenschstein and felt micro-managed by Damagnez. Yagudaev reported that this situation made him feel like a "second-class citizen." But no evidence suggests that Yagudaev complained of more than general unfair treatment. There is no evidence that he expressed a view that his treatment resulted from age discrimination (or, for that matter, discrimination on the basis of another protected characteristic). On the summary judgment record, CAASI did not have a basis to understand that Yagudaev, in his 2015 communications with HR, was opposing statutorily prohibited discrimination.

Yagudaev's second theory, centered on his counsel's April 22, 2016 letter to CAASI, fares no better.

Although that letter explicitly referred to age discrimination, it is too little, and came too late, to support Yagudaev's claim that a retaliatory motive played a part in his termination the following month. By the time that Yagudaev's lawyer wrote CAASI, Yagudaev was 75 days into the 90-day PIP. His supervisors' well-documented dismay with his performance long predated the letter, as had the PIP. Indeed, by Yagudaev's own account, his termination had been foretold before his attorney put pen to paper: Two days *before* the letter was sent, Yagudaev wrote an email to several colleagues, stating that he "expect[ed] HR will call me by the end of the month and give me my walking papers" and providing his contact information "in case I don't get the opportunity to do it *when* they fire me." Def. 56.1 ¶ 145 (emphasis added). Even Yagudaev conceded at his deposition that he was terminated as a result of his performance, not the April 22, 2016 letter. *Id.* ¶¶ 149–150.

On these facts, the temporal proximity between the April 22, 2016 letter and Yagudaev's May 13, 2016 discharge is insufficient to save his retaliation claim. *See, e.g.*, *Slattery*, 248 F.3d at 95 ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355, 373–74 (S.D.N.Y. 2011) (finding that plaintiff had not made out a *prima facie* case of retaliation when she received a "long string of negative evaluations" seven months before she began to participate in protected activity); *Middleton v. Metro. Coll. of N.Y.*, 545 F. Supp. 2d 369, 374–76 (S.D.N.Y. 2008) (dismissing retaliation claim where plaintiff's alleged protected activity occurred only after plaintiff learned she had been investigated by

human resources director); *Koester v. N.Y. Blood Ctr.*, 866 N.Y.S.2d 87, 89 (1st Dep't 2008) ("[Where] termination followed more than a year of progressive disciplinary complaints from plaintiff's supervisors[,] . . . the temporal proximity between plaintiff's [internal discrimination] complaint and defendant's adverse action is alone insufficient to support a claim of retaliatory discharge."); *Domb v. Metro. Life Ins. Co.*, No. 01 Civ. 10074 (GEL), 2003 WL 21878784, at *9 (S.D.N.Y. Aug. 7, 2003) (granting summary judgment for defendant and finding no retaliation when plaintiff was fired the same day as conclusion of investigation into her discrimination complaint, when complaint followed performance warnings to plaintiff).

In any event, even assuming that counsel's April 22, 2016 letter enabled Yagudaev to make out a *prima facie* case of retaliation, the evidence would not permit a jury to find that CAASI's proffered legitimate, non-discriminatory reason for terminating him—his long subpar performance—was a pretext for retaliation. As with the discrimination claim above, Yagudaev would have the burden to prove by a preponderance of the evidence that retaliation for a protected activity had been the "but-for" cause of his termination. The summary judgment record cannot support this, any more than it supports that discrimination by Damagnez was a but-for cause of Yagudaev's discharge. Yagudaev, in fact, has come forward with no evidence, other than the inference he urges be drawn based on temporal proximity, that his counsel's April 22, 2016 letter catalyzed his discharge. *See, e.g.*, *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. 2010) ("[Plaintiff's] retaliatory termination claim fails because, even if she can show a prima facie case of retaliation, defendants have put forth a legitimate, non-discriminatory reason for her termination, and [plaintiff] has not responded with facts sufficient to warrant a reasonable jury finding by a preponderance of the evidence that [the reason was pretext for retaliation]."). On the contrary, in light of the overwhelming evidence of Yagudaev's terminal

status at CAASI as of the date of that letter, no reasonable juror could conclude that "but for" his counsel's complaint, Yagudaev would not have been fired.

Accordingly, CAASI is entitled to summary judgment on Yagudaev's retaliation claims under the ADEA and NYSHRL.

### C. NYCHRL Claims

Yagudaev also brings claims of age discrimination and retaliation in violation of the NYCHRL. "District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks and citations omitted); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *see also One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

Judicial economy and convenience favored resolution of Yagudaev's NYSHRL claims because "the substantive standard for liability under the [two] statutory schemes are

coextensive." *Adloox I*, 2018 WL 5266875, at *9 (quoting *Caesar v. Riverbay Corp.*, No. 15 Civ. 8911 (NRB), 2017 WL 6887597, at *12 (S.D.N.Y. Dec. 27, 2017)). By contrast, those considerations favor letting New York state courts address Yagudaev's NYCHRL claims, which must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Given the "slow development of case law regarding the appropriate standard by which to evaluate NYCHRL claims at the summary judgment stage," *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 835 (S.D.N.Y. 2013), the wholly separate and independent inquiry the Court would need to undertake in this "evolv[ing]" area of law, *see id.* at 835 n.6, and the parties' failure to brief separately and adequately the NYCHRL claims, the factors of convenience, comity, and judicial economy point the Court toward declining jurisdiction over Yagudaev's NYCHRL claims. *See, e.g.*, *Ehrbar*, 131 F. Supp. 3d at 37 (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment as to ADEA and NYSHRL age discrimination and retaliation claims); *Adloox I*, 2018 WL 5266875, at *9 (declining to exercise supplemental jurisdiction over NYCHRL claims after granting summary judgment for defendants with respect to ADEA and NYSHRL claims); *Triana v. Sodexo, Inc.*, No. 15 Civ. 5895 (RA), 2018 WL 6413151, at *8 (S.D.N.Y. Dec. 5, 2018) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment as to federal law claims).

Accordingly, the Court declines to exercise supplemental jurisdiction over Yagudaev's remaining state law claims. Yagudaev's age discrimination and retaliation claims pursuant to the NYCHRL are therefore dismissed, without prejudice to Yagudaev's right to re-file them in state court.

## CONCLUSION

For the foregoing reasons, CAASI's motion for summary judgment is granted with respect to Yagudaev's ADEA and NYSHRL claims. The Court declines to exercise supplemental jurisdiction over Yagudaev's NYCHRL claims, and therefore dismisses these claims without prejudice to re-filing in state court.

The Clerk of Court is respectfully directed to terminate the motion pending at Docket 39 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 6, 2020
New York, New York